# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 19-853V**
Filed: September 30, 2026

| | |
|---|---|
| SANELA REDZEPAGIC, | * |
| Petitioner, | * |
| v. | * |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * |
| Respondent. | * |

*Maximillian Muller, Esq.*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*Catherine Stolar, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

**Roth**, Special Master:

On June 10, 2019, Sanela Nicocevic filed a petition on behalf of her then-minor child, S.R., for compensation pursuant to the National Vaccine Injury Compensation Program,[2] alleging that S.R. developed Guillain-Barré Syndrome ("GBS") as a result of the influenza ("flu") vaccine she received on January 29, 2018. Petition, ECF No. 1. Sanela Redzepagic was substituted as the petitioner when she reached the age of majority. ECF Nos. 30-31.

In an amended Rule 4(c) Report, respondent stated that he would not continue to defend the case and requested a ruling on the record regarding entitlement based on the record as it currently existed. *See* ECF No. 26 at 1. Petitioner then filed her Motion for Ruling on the Record and respondent responded thereto. ECF Nos. 33, 35.

A Ruling on Entitlement was issued on March 19, 2025, followed by a Damages Order. ECF. Nos. 36-37. The parties discussed informal resolution of damages but were ultimately unable

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned finds that the identified material fits within this definition, such material will be redacted from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

to reach an agreement. The parties then filed simultaneous briefs on November 17, 2025 in support of their respective positions on damages. ECF Nos. 42-43. Petitioner filed a reply on December 18, 2025. ECF No. 44.

For the reasons described below, I find petitioner is entitled to an award of damages in the amount of $125,000.00 for actual pain and suffering and $23,796.62 to satisfy a Medicaid Lien.

## I. Background

### A. Relevant Procedural History

Following the issuance of a Ruling on Entitlement on March 19, 2025, the parties engaged in settlement negotiations but then filed a joint status report on September 2, 2025 advising that petitioner had rejected respondent's proffer made on July 31, 2025. A briefing schedule was requested and issued that day. ECF No. 41.

Petitioner filed a Memorandum on Damages ("Pet. Memo") on November 17, 2025. ECF No. 42. Respondent filed his Memorandum on Damages ("Resp. Memo") the same day. ECF No. 43. Petitioner filed a Reply on December 18, 2025. ECF No. 44.

This matter is ripe for adjudication.

### B. Relevant Medical History

Petitioner was a healthy 15-year-old with no prior medical issues and received all her vaccinations without event. She presented to her primary care physician ("PCP") on January 29, 2018 for a physical. Pet. Ex. 3 at 35. Following a normal examination, she received the subject influenza vaccine. *Id*. at 37-38.

Petitioner presented to the Stamford Health Emergency Room ("Stamford ER") on March 20, 2018 for generalized body aches that began on Saturday[3] which were worse in her legs than in her upper body. Pet. Ex. 9 at 136. She reported no fever, illnesses or travel. She described pain from her lower back to her lower legs that was sharp, mild to moderate, and intermittent, aggravated by movement ongoing for three to four days. Her symptoms started after vigorously exercising. *Id*. The impression was myositis. She was prescribed NSAIDs and discharged. *Id*. at 138-39.

She returned three days later on March 23, 2018. Pet. Ex. 9 at 104. She reported continued weakness and body aches since she last presented. Now, she could not walk without calf pain and reported some dizziness and blurred vision since taking the Motrin prescribed. *Id*. Her blood work was normal. Her headaches resolved after eating. The impression was leg cramps. *Id*. at 104-06. She was discharged and walked out of the ER but felt weak. Her mother went to get the car and upon her return, found petitioner lying on her side. She refused reevaluation. *Id*. at 107.

[3] The Saturday prior to this presentation was March 17, 2018.

The next day, March 24, 2018, petitioner presented to Optimus Health Care Clinic reporting "[t]otal body weakness." Pet. Ex. 3 at 31. Her mother reported that petitioner had been sick since getting the flu vaccine at the end of January and had presented to the ER twice for generalized body aches and weakness. She was concerned about GBS. *Id*. There was no family history of muscle disorders. Petitioner began having difficulty walking last week then was unable to walk and had to be picked up from school. Petitioner denied leg pain but reported toe numbness, tingling and weakness in her feet mainly when walking. She reported tingling in her fingertips, jaw pain, difficulty eating, and headaches. She had dizziness when rising, felt unsteady, and was experiencing a "room spinning sensation." *Id*. On examination, she had tenderness in the back of her legs with weakness and an unstable gait, but normal reflexes and strength. The assessment was myalgias and headache. *Id*. at 33. She was prescribed muscle relaxers for leg pain and advised to continue taking over the counter NSAIDs. *Id*.

On March 25, 2018, petitioner presented to the ER at Stamford again and reported bilateral lower extremity weakness with difficulty walking. Pet. Ex. 9 at 80. She had no fever, shortness of breath, or pain. Her lower extremity weakness had progressed over the past 24 hours. *Id*. Examination revealed weakness of the lower extremities. *Id*. at 81-82. The differential diagnosis included GBS, myalgia, myositis, post viral weakness, ADEM, and transverse myelitis. *Id*. at 82. A head CT was unremarkable. *Id*. at 83. She was transferred to Yale New Haven Children's Hospital ("Yale") at the recommendation of pediatric neurology. *Id*. at 83-84.

Concern for GBS versus cord compression was noted upon arrival at Yale. Pet. Ex. 4 at 29. Petitioner reported headaches relieved with Advil, dizziness on standing, and blurry and double vision in her left eye that began two days ago. *Id*. She reported flu-like symptoms three weeks ago. She presented to the Stamford ER three times for bilateral lower extremity weakness. Her blood work and CT had been normal. *Id*. at 11, 29. During a neurology consultation, she reported receipt of a flu shot in January 2018, after which she developed flu-like symptoms which resolved but reoccurred several weeks later. She then developed lower extremity pain and weakness, that was greater on the right than on the left. *Id*. at 10, 29.

Petitioner was admitted with extensive viral labs performed. All were negative. Pet. Ex. 4 at 15, 22-23, 58-59. The neurological assessment included an otherwise healthy teenager with asymmetrical weakness, diffuse hyporeflexia, and intermittent blurry/double vision with concern for GBS, transverse myelitis, neuromyelitis optica, and other demyelinating processes or cord compression. *Id*. at 43. A lumbar puncture showed albuminocytologic dissociation, CSF protein at 162 and 9 WBCs consistent with GBS. *Id*. at 44. Brain and spine imaging revealed enhancement of the cauda equine nerve root with no other abnormalities consistent with GBS. *Id*. at 35-36, 44. There was no bladder or bowel involvement. *Id*. at 33. Two days of IVIG was ordered, with PLEX to be considered if she worsened. She was to be closely monitored. *Id*. at 44.

Following two days of IVIG, petitioner showed significant improvement. She was able to walk and demonstrated improved muscle strength. She was discharged home on March 28, 2018. She was to attend outpatient rehabilitation. Pet. Ex. 4 at 48-49.

On April 2, 2018, petitioner reported poor appetite, nausea, blurred vision, and headache. She had started physical therapy with slow improvement of her bilateral leg weakness. Pet. Ex. 3

at 27. She returned on April 5, 2018, with continued improvement and was walking without assistance. She still felt some weakness in her arms and legs. *Id*. at 23. No sensory abnormalities were noted, and her gait, stance, and reflexes were normal. *Id*. at 25.

A physical therapy record from April 25, 2018 included a 15-year-old with GBS that started around March 10 or 11 after receiving a flu shot. It began with tingling in her hands and feet. She then started to walk funny due to weakness. She presented to the ER multiple times. She received two days of IVIG after the GBS diagnosis. Her symptoms were a lot better, but she felt uncomfortable walking and was not 100% confident. She had a lot of headaches. Pet. Ex. 3 at 57; Pet. Ex. 8 at 69.

Petitioner returned to the neurologist on April 27, 2018. She had steady improvement, was attending physical therapy and able to walk but was not entirely back to baseline. Pet. Ex. 5 at 7. She reported headaches for over a year that worsened after the lumbar puncture. She described the headaches as frontal and temporal bilaterally with photophobia, better when laying in a dark room without nausea, vomiting, aura, or warning. She was taking Advil daily. *Id*. She was in high school and did well academically. The impression was resolving GBS with regained reflexes lost during the acute phase of her illness, migraines without aura, and chronic daily headaches. She was to continue with physical therapy, stop taking Advil, and return in three months. *Id*. at 7-8.

Petitioner attended 12 PT sessions and was discharged on June 25, 2018 with a home exercise program. Gains in strength, coordination, and balance with reduced fatigue and improved functional mobility were noted. Pet. Ex. 9 at 43-44.

At her neurology follow up on September 27, 2018, she reported that she had completed physical therapy and had no weakness or tingling but had continued headaches with photosensitivity. Pet. Ex. 5 at 9. She did not eat well and was not doing the recommended home exercises. She expressed anxiety over schoolwork. *Id*. The impression included a 15-year-old with a history of GBS and migraine headaches. Neurological examination was normal. She was overusing Advil, had poor nutrition during the day, was not sleeping enough at night, and napped frequently after school. Migraine prevention was discussed in detail. *Id*. at 11-12.

Petitioner returned to the neurologist on November 15, 2018. Her headaches were now only occurring a couple of times a month. Pet. Ex. 5 at 13. Eating breakfast helped. She was still stressed, often up until 2:00 am. She was not exercising, but her strength continued to improve. *Id*.

Petitioner's subsequent medical visits involved a rash on her face, left elbow, and upper chest on February 2, 2019 and February 8, 2019. Pet. Ex. 3 at 20, 12-15. She continued to report fatigue. *Id*.

Petitioner presented to the Stamford ER on March 24, 2019 for knee pain. She reported dancing in heels at a party when her knee "popped out." She had significant pain with weight bearing. Pet. Ex. 9 at 8. X-rays were negative. There was some soft tissue swelling. She was encouraged to take Tylenol or Motrin and ice the knee. *Id*. at 9.

Petitioner presented to a rheumatologist on March 28, 2019 for a facial rash that waxed and waned and was itchy and dry. Pet. Ex. 7 at 6. She reported a history of chronic headaches, an oral ulcer a months ago, fatigue, and a recent knee injury. She also reported some color changes in her hands with cold exposure. Her ANA was low positive and noted as a nonspecific finding seen in up to 20% of the healthy pediatric population. Other labs were normal. *Id*. Her fatigue seemed to be related to sleep hygiene. The assessment was pruritic rash of unclear etiology. No further testing was recommended. *Id*. at 10.

At her annual physical on July 22, 2019, she had continuing rash that would come and go on her face and body. Pet. Ex. 8 at 6. Her examination was otherwise normal. *Id*. at 6-9. No further medical records were provided.

### C. Petitioner's Affidavit

Petitioner's affidavit was filed on December 6, 2021. She affirmed receipt of a flu vaccine on January 29, 2018 at a routine checkup. Pet. Ex. 25 at 1. "Right after the shot, I started experiencing flu-symptoms. I couldn't go to school for a few days because I had a fever, started throwing up, and was sore." She then felt better after about a week and returned to school. *Id*.

She felt sick again around March 7, 2018 with flu-like symptoms, fatigue, and nausea followed by sharp cramps in her legs. She was "still going to school with all that pain and trying to be present." She called her mother to pick her up when she was unable to go up the stairs at school. Pet. Ex. 25 at 1. She stopped going to school because the symptoms were getting worse. *Id*.

She started to have numbness and tingling in her toes and feet and could not walk. She went to the ER multiple times, but there was no diagnosis. Pet. Ex. 25 at 1-2. She was told it was muscle cramps and given ibuprofen which did not help. *Id*. at 2.

Petitioner affirmed that she stayed home in bed and could not walk, stand, or do anything. Pet. Ex. 25 at 2. She received a phone call from the ER advising them to come back right away. She was then transferred to Yale New Haven Children's Hospital, where she underwent a spinal tap and other testing. *Id*. She was diagnosed with GBS, received three days of IVIG, and was in the hospital for a week. She couldn't go to school because she was weak and could not walk properly. She went to physical therapy for three months after her hospitalization. *Id.*

Petitioner affirmed she was also having bad migraines and had to see a neurologist. She missed a lot of school and had to transfer schools because she fell behind. Pet. Ex. 25 at 2. About two and half years ago, she dislocated her knee and had to use crutches for a week. She thinks this was partially because her legs were still weak. She still gets tired, cannot walk or stand for long periods of time, and feels her legs are weaker. *Id*.

Petitioner's current complaints, if any, are unknown.

### D. Petitioner's School Attendance Record

Petitioner was referred to Stamford Academy from her district school, Stamford High School, due to extensive absences. It is unclear from the record when petitioner transferred to Stamford Academy, but her records show extensive absences and tardiness both prior to and after her GBS diagnosis. *See generally* Pet. Ex. 11.

## II. The Parties' Arguments

### A. Petitioner's Submissions

In support of her demand of $150,000.00 for pain and suffering, petitioner highlighted her admission to the hospital, IVIG treatments, outpatient physical therapy, and the duration of her GBS symptoms, including ongoing fatigue, migraines, and daily headaches. Pet. Memo at 11-12. She argued that her illness had a substantial impact on her life. *Id*. at 12. She missed two months of school, had to transfer schools because she fell so far behind, and has "continued to experience weakness, fatigue and migraines for years after her initial hospitalization." *Id*. at 12-13.

Petitioner cited several prior awards for pain and suffering in GBS cases in support of her demand.

In *Maxwell v. Sec'y of Health & Human Servs.,* No. 21-1877V, 2024 WL 1343007, at *1 (Fed. Cl. Spec. Mstr. Feb. 27, 2024), the petitioner was hospitalized for 9 days, received 5 days of IVIG, was discharged to inpatient care for 7 days, and felt normal upon discharge home with mild residual symptoms that substantially resolved within 3 months. The award for pain and suffering was $140,000.00. Pet. Memo at 8.

In *Gruba v. Sec'y of Health & Human Servs.*, No. 19-1157V, 2021 WL 1925630 (Fed Cl. Spec. Mstr. Apr. 13, 2021) the petitioner did not need significant assistance in walking, had no respiratory distress, did not require neuropathic pain medication, and was largely stable with some reduction from baseline at the end of 6 months and had recovered within one year of her diagnosis. The award for pain and suffering was $165,000.00. Pet. Memo at 9.

In *Gross v. Sec'y of Health & Human Servs*., No. 19-835V (Fed. Cl. Spec. Mstr. March 11, 2021) the petitioner was awarded $160,000.00 for pain and suffering for GBS following two ER visits, EMG and lumbar puncture, and five days of IVIG. Pet. Memo at 9.

In *Boyd v. Sec'y of Health & Human Servs.,* No. 23-714V, 2025 WL 1892080, at *1 (Fed. Cl. Spec. Mstr. June 3, 2025), the petitioner received $167,500.00 in pain and suffering following a 10-day hospital stay, 29 days of inpatient rehabilitation, and ongoing numbness and weakness in the upper and lower extremities requiring weekly B-12 injections for 12-14 months post-hospitalization. Pet. Memo at 9.

The petitioner in *W.B. v. Sec'y of Health & Human Servs*., No. 18-1634V (Fed. Cl. Spec. Mstr. August 7, 2020) was a healthy, active physician prior to his GBS. He was hospitalized overnight, received 2 IVIG treatments, was discharged to his home for the remainder of the IVIG treatments, and resumed working half-day shifts and doing yard work 2 months later. Within a

year, his GBS symptoms had largely resolved but for fatigue. He was awarded $155,000.00 in pain and suffering. Pet. Memo at 10.

In *Robinson v. Sec'y of Health and Human Servs.*, No. 18-88V (Fed. Cl. Spec. Mstr. August 27, 2020), the petitioner was awarded $160,000.00 following 6 days in the hospital, 5 rounds of IVIG, 20 physical therapy visits, and a home exercise program. The petitioner had continuing weakness, numbness, nerve pain, and balance problems that her neurologist did not believe would ever resolve. Pet. Memo at 10.

In *Weil v. Secretary of Health & Human Services*, 2023 WL 1778281, No. 21-0831V (Fed. Cl. Spec. Mstr. Feb. 6, 2023), the petitioner was awarded $140,000.00 for pain and suffering following 5 days in the hospital for IVIG treatments, 20 days in inpatient rehabilitation, then one month in outpatient physical therapy. He required a walker when he returned home. Pet. Memo at 10-11.

Petitioner argued that her injuries are most similar to the minor in *Maxwell* who was awarded $140,000.00 after suffering moderate GBS with a good recovery. She had a similar treatment course with a brief hospitalization with IVIG, followed by outpatient PT and some ongoing symptoms. She argued that her illness had a substantial impact on her life, causing her to miss school, ultimately transfer schools, and had residual symptoms like migraines, weakness, and fatigue. Pet. Memo at 12-13; Pet. Ex. 25 at 2. Therefore, her request of $150,000.00 is both reasonable and justified. Pet. Memo at 13.

Petitioner argued that there were important distinctions between her case and the single case respondent cited, *Koonce v. Sec'y of Health & Human Servs.*, No. 21-1560V, 2024 WL 3567368 (Fed. Cl. Spec. Mstr. July 8, 2024). Reply at 1. First, Mr. Koonce's sequela was milder, he received less treatment, he was "vastly improved" 6 weeks after his hospitalization, and did not need outpatient PT, medication, or treatment. *Id*. at 2. Second, Mr. Koonce was not a minor like petitioner who was only 15 years old at the time of her injury "and the injury had a unique and impactful effect on her life." Petitioner maintained that her fatigue was related to her GBS, arguing that fatigue is a commonly recognized sequela of GBS in the Program. *Id*. n. 2, citing *Elenteny v. Sec'y of Health & Human Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023).

Further, petitioner argued that *Koonce* was an outlier and unlike the majority of GBS awards in the Program. Reply at 2. Petitioner pointed to the Chief Special Master's decision in *Holmberg v. Sec'y of Health & Human Servs.,* No. 21-1132V, 2024 WL 4607929, at *3-5 (Fed. Cl. Spec. Mstr. Oct. 7, 2024) in which he discussed the standard for determining damages in GBS cases due to the more frightening and inherently severe character of GBS in comparison to other Program claims. He noted that, in July of 2024, following a review of 49 reasoned GBS damages decisions in the Special Processing Unit ("SPU"), nearly every damages decision award was over $100,000 with only one lower award of $92,000. *Id*. at 9. The remaining 48 awards far exceeded $100,000. The first-quartile value was $155,000. The median award was $165,000. *Id*.; Reply at 2.

Petitioner argued that respondent's reliance on *Koonce* is outside the bounds of typical Program GBS pain and suffering damage awards and is therefore unpersuasive. Reply at 3. *Maxwell* is a more appropriate comparison, as it involved a teenager, a 9-day hospitalization, inpatient rehabilitation, swift recovery with mild residuals and three PT sessions. The Chief Special Master awarded $140,000.00 in *Maxwell*. *Id*.

**B. Respondent's Submission**

Respondent proposed an award of $70,000.00 for pain and suffering because petitioner had an "exceptionally mild" course of GBS that quickly resolved with no lasting sequela. Resp. Memo at 12-14. She had a brief hospital stay of only three days total, with only two days of IVIG, was discharged home, received outpatient physical therapy and had a near perfect functional score by June of 2015. *Id*. at 12. Thus, she was back to baseline about three months after her discharge from the hospital. Further, her medical records do not support her claim that her continued headaches, fatigue, or dislocated knee from weakness were related to GBS. *Id*.

Respondent further argued that petitioner's GBS had "no detrimental effect" on her overall academic performance.[4] Resp. Memo at 14. She was already enrolled at Stamford Academy when she got sick in March of 2018, and thus her transfer to Stamford Academy preceded her GBS. The records also indicate that her poor school attendance prompted her transfer. Further, her medical records include her denying any difficulty in school, good school performance, no concerns at school, and reading and math performance consistent with her grade level. *Id*.; Pet. Ex. 7 at 6; Pet. Ex. 8 at 6-7, 9. Therefore, there is no evidence to substantiate that petitioner's GBS had a detrimental effect on her academic progress. Resp. Memo at 14-15.

Finally, respondent argued that petitioner's text messages[5] to her mother should be given *de minimis* weight because the full conversations were not provided, the mother's texts were not in English with no translation provided, and other than one message in which petitioner mentioned the flu vaccine, the remainder of the messages do not provide details, making it impossible to relate them to her GBS. Resp. Memo at 15-16; Pet. Ex. 26 at 6-10. Further, the text messages were not authenticated, so the Court cannot consider them reliable. Resp. Memo at 15; *see Burrows v. Sec'y of Health & Human Servs.,* No. 23-925V, 2025 WL 2630628, at *6 n. 11 (Fed. Cl. Spec. Mstr. Aug. 5, 2025); Vaccine Rule 8(b)(1).

In light of the foregoing, respondent submitted that *Koonce* was most similar to petitioner's case. Mr. Koonce was awarded $70,000 for pain and suffering from GBS.[6] Resp. Memo at 16. Respondent argued that the Court in *Koonce* considered several factors in reaching its decision, including a short 4-day hospital stay, quick improvement, and receipt of his fifth and final IVIG dose at home; that he had no trouble walking or breathing, did not require inpatient rehabilitation, and did not participate in outpatient physical therapy. He was noted to be "doing great" one month after his discharge from the hospital. Two years after his injury, Mr. Koonce still complained of

---

[4] Petitioner's argument regarded her school attendance—not performance. *See generally* Pet. Memo; Reply.
[5] Though petitioner did file the text messages, she did not mention the text messages in her Memorandum on Damages or Reply. *See generally* Pet. Memo; Reply.
[6] Mr. Koonce was also awarded $27,000 in pain and suffering for a separate injury. Resp. Memo at 16 n. 6.

residual numbness from his GBS, but it did not interfere with his physical activities. Resp. Memo at 16; *Koonce*, No. 21-1560V, 2024 WL 3567368, at *2-5.

Respondent argued that petitioner here was hospitalized for 3 days, had a 2-day course of IVIG, had no trouble breathing, and was discharged home rather than to inpatient rehabilitation. Though she did have trouble ambulating, this symptom quickly resolved with IVIG therapy and she was walking on her own upon discharge from the hospital. Resp. Memo at 17; Pet. Ex. 4 at 10, 48, 49. Petitioner participated in outpatient PT, but her GBS sequela resolved within 3 months of discharge from the hospital, whereas Mr. Koonce suffered from GBS related numbness for two years post-injury. *Id*. "Given the strong parallels between petitioner's case and that of Mr. Koonce, this Court is on good grounds in awarding $70,000.00 in pain and suffering to petitioner." Resp. Memo at 17.

## III. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Although pain and suffering in the past was often determined based on a continuum, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). In *Graves,* the Court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off

*higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* does not dictate the outcome in this case, it offers a reasoned understanding of the issues involved in pain and suffering calculations.

To aid in my decision, I may consider prior pain and suffering awards for the appropriate amount of compensation for pain and suffering along with my own experience in adjudicating other similar claims. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

## IV. Discussion

Petitioner was 15 years old at the time she received the subject vaccination. Neither party disputes petitioner's awareness of her injury. In analyzing the duration and severity of the injury, I have reviewed the record as a whole including the medical records, petitioner's affidavit, and all assertions made by the parties in their written submissions.

Petitioner's medical records and affidavit describe the course of her GBS with several ER visits and an urgent care visit prior to her transport by ambulance to the hospital where she was diagnosed with GBS and began treatment. Pet. Ex. 3 at 31-33; Pet. Ex. 4 at 13, 254; Pet. Ex. 9 at 80-84, 104-07, 136-39; Pet. Ex. 25 at 2. She was hospitalized for three days, had extensive testing including a lumbar puncture, and received two days of IVIG infusions with good response. She was discharged home and was able to walk out of the hospital. Pet. Ex. 4 at 35-36, 44. Within weeks, her reflexes and strength had returned. Pet. Ex. 3 at 23-27; Pet. Ex. 5 at 7-8. She attended 12 sessions of physical therapy with a good result and was discharged on June 25, 2018. Pet. Ex. 9 at 43-44.

Petitioner alleged she had ongoing sequela from GBS, including fatigue and headaches. Pet. Memo at 12-13; Pet. Ex. 25 at 2. However, petitioner's reports to her medical providers include a history of "chronic daily headaches" for over a year prior to her vaccination that increased following the lumbar puncture. Her neurologist attributed her headaches to poor sleeping and eating habits, and they improved once she started eating breakfast and "with lifestyle measures." Pet. Ex. 5 at 7-8, 11-13, 16. Thus, the evidence does not support that her headaches were associated with her GBS.

Petitioner also argued that she was forced to change schools because of extensive absences due to GBS. Pet. Memo at 12-13; Pet. Ex. 25 at 2. Respondent argued that she transferred schools prior to becoming sick with GBS. Resp. Memo at 14. It is not clear from the records when she transferred schools. Pet. Ex. 3 at 36 (PCP visit on 1/29/2018 noting she was enrolled at Stamford High); Pet. Ex. 5 at 7 (neurology visit on 4/27/2018 stating she was at Stamford High School); Pet. Ex. 5 at 9 (neurology visit on 9/27/2018 noting she attends the "local school system and does well academically"); Pet. Ex. 25 at 2 (petitioner affirming that her absences "led [her] to transferring to another school" but not stating when this occurred). Regardless, her school attendance records show repetitive absences and tardiness both before and after her GBS injury. Pet. Ex. 11; *see also* Pet. Ex. 5 at 9 (neurology noting that she was "not missing school due to the headaches").

Therefore, the evidence does not support petitioner's contention that her chronic absences and/or school transfer were related to her GBS.

Finally, in her affidavit, petitioner submitted that she suffered a knee injury due to leg weakness from GBS. Pet. Ex. 25 at 2. However, her knee injury occurred over a year after her diagnosis while she was dancing at a party in heels. Pet. Ex. 9 at 8. When she presented the next day, the record documented 5/5 strength. *Id*. at 9. Furthermore, petitioner was discharged from PT on June 25, 2018—roughly 9 months prior to this injury—having met all goals. *Id*. at 43-44. To the extent that petitioner argues her knee injury was related to her GBS, the evidence is insufficient to support that conclusion.

Turning next to comparable damage awards, there are only a handful of GBS cases that involve minors. Petitioner cited *Maxwell*, which involved a 17-year-old who was hospitalized for 9 days, in inpatient rehab for 7 days, received physical therapy thereafter and had significant improvement within three months, with only some lingering fatigue. The petitioner was awarded $140,000 for actual pain and suffering. *Maxwell*, No. 21-1877V, 2024 WL 1343007, at *5.

In *Voeller*, the minor was 4 years old when she suffered GBS, had a difficult course with multiple ER visits before diagnosis, was hospitalized for 7 days, received IVIG and pain medications, was in inpatient rehab for 16 days, and attended 7 PT sessions. She had an excellent recovery and suffered from common ongoing sequela including fatigue but there was no evidence that the sequela had any significant impact on her life. The petitioner was awarded $185,000 in actual pain and suffering. *Voeller v. Sec'y of Health & Human Servs.*, No. 20-1526V, 2023 WL 5019830, at *1, 8, 10 (Fed. Cl. Spec. Mstr. July 6, 2023).

In *Alanis*, the minor was 11 years old when he suffered from GBS, was hospitalized for 3 weeks, underwent a lumbar puncture, was in inpatient rehab for just over 2 weeks, received 4 doses of IVIG, and attended 47 PT and OT sessions. Though he did have lingering sequelae, they appeared to be mild and intermittent. In awarding $140,000 in actual pain and suffering, the Chief Special Master concluded that the minor did not suffer severe GBS when compared to other Program claimants. *Alanis v. Sec'y of Health & Human Servs.*, No. 22-564V, 2025 WL 1721192, at *2-3 (Fed. Cl. Spec. Mstr. May 13, 2025).

The minor in *Rastetter* was a 13-year-old, had a severe case of GBS with a 34-day hospitalization, lumbar puncture, intubation, catheter placement, two rounds of IVIG, and extensive outpatient PT and OT. The petitioner was awarded $195,000 for actual pain and suffering. *Rastetter v. Sec'y of Health & Human Servs*., No. 19-1840V, 2023 WL 5552317, at *2-4, 8, 12 (Fed. Cl. Spec. Mstr. Aug. 3, 2023).

The higher awards detailed above are reasonable given the minor's age and the severity of their GBS course (*Voeller* was a 4-year-old who spent nearly one month as an inpatient; *Rastetter* was a 13-year-old who spent over a month hospitalized, was intubated, and had catheter placement). Fortunately, petitioner's course here did not involve such lengthy admissions or invasive treatments.

Petitioner's case is more in line with that of *Maxwell* and *Alanis*, though arguably less severe given that petitioner spent three days hospitalized, responded well to IVIG treatments, and was discharged home without the need for inpatient rehabilitation or extensive outpatient therapy.

Every case in the Program is unique with its own set of facts that, while important, must be compared to other cases to reach the appropriate damages valuation. A wide spectrum of recovery is seen in GBS patients, with many never completely recovering. Though age is not a specific factor to be considered in severity, duration, or awareness, it is certainly a subjective factor that has been considered in both the recovery and the impact on suffering when assessing damages. *Rastetter*, No. 19-1840V, 2023 WL 5552317, at *9. Whether mild or severe, the onset of pain, weakness, numbness, and tingling in the extremities and the loss of the ability to walk when previously healthy is surely frightening for anyone, particularly for a minor.

Without minimizing what petitioner went through, petitioner's GBS was thankfully milder than many of the cases seen in the Program. Fortunately, she appears to have made a full recovery within 6 months with only some lingering fatigue, as evidenced by her medical records, dancing at a party a year later, doing well academically, and graduating high school. *See* Pet. Ex. 11 at 1.

Given petitioner's treatment course and overall recovery, as well as her age at the time of her injury, I find respondent's recommendation of $70,000.00 too low. However, petitioner's demand of $150,000.00 was higher than the amount awarded to both petitioners in *Maxwell* and *Alanis*, both of whom had longer hospital stays than did petitioner here and required inpatient rehabilitation.

Balancing the severity of petitioner's GBS injury and its impact on her against her excellent recovery, and considering the arguments presented by both parties, a review of other GBS awards, and based on the record as a whole, I find an award of $125,000.00 for actual/past pain and suffering reasonable and appropriate in this case. This figure accounts for petitioner's specific circumstances but is lower than her demand because of the limited medical intervention she required and her subsequent recovery with minimal, if any, GBS sequela.

## V. Conclusion

For the reasons discussed above, after considering the record in its entirety, I find that $125,000.00 represents a fair and appropriate amount of compensation for petitioner's pain and suffering. Thus, petitioner is awarded the following:

a. **A lump sum of $125,000.00** for actual pain and suffering, to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement to petitioner; and

b. **A lump sum of $23,796.62** representing compensation for satisfaction of the Medicaid lien, to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.

The Clerk of Court shall enter judgment accordingly.[7]

**IT IS SO ORDERED.**

**s/Mindy Michaels Roth**
Mindy Michaels Roth
Special Master

[7] Pursuant to Vaccine Rule 11(a), if a motion for review is not filed within 30 days after the filing of the special master's decision, the clerk will enter judgment immediately.